# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RICHARD M. ARNOLD,

      Petitioner,

      v.                               **Case No. 15-CV-1524**

REED RICHARDSON,

      Respondent.

## DECISION AND ORDER

Richard M. Arnold, a prisoner in state custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket # 1.) Arnold is serving a life sentence for repeated sexual assault of a child. (*Id.*) Arnold claims actual innocence both as an exception to an untimely petition and as a free-standing claim for relief. On August 16, 2016, I ruled that Arnold's petition was untimely and that he had not established his claim of actual innocence to overcome the time bar and dismissed his petition. (Docket # 17.) On September 17, 2018, the U.S. Court of Appeals for the Seventh Circuit vacated the decision and remanded with instructions to hold an evidentiary hearing on Arnold's claim of actual innocence. *Arnold v. Dittmann*, 901 F.3d 830 (7th Cir. 2018). (Docket # 32.) An evidentiary hearing was held on February 4 and May 13, 2019. (Docket # 42, 53.) Having considered the evidence presented at the evidentiary hearing in light of the totality of the record, I conclude that Arnold has not met the actual

---

[1] On April 29, 2019, respondent Michael Dittmann was replaced by respondent Reed Richardson, currently the warden of the facility where Arnold is incarcerated.

innocence exception to overcome the time bar. Accordingly, his petition must be dismissed as untimely and I need not address his free-standing claim of actual innocence.

## PROCEDURAL BACKGROUND

On July 17, 2008, a Winnebago County jury convicted Arnold of repeated sexual assault of the same child—his son, M.A. (Judgment of Conviction, Docket #14-1.) He was sentenced to life in prison without the possibility of parole as a persistent repeater. (*Id.*) Arnold's motion for post-conviction relief on the grounds of trial court error was denied, and the Wisconsin Court of Appeals affirmed on October 26, 2011. *State of Wisconsin v. Arnold*, Appeal No. 2010AP1532-CR (Oct. 26, 2011). (Docket # 14-2.) Arnold appealed to the Wisconsin Supreme Court, which denied his petition on January 24, 2012. *State of Wisconsin v. Arnold*, 339 Wis. 2d 735, 810 N.W.2d 221 (2012). (Docket # 14-4 at 1.)

In September 2013, Arnold filed a post-conviction motion based on a November 2011 affidavit signed by M.A. stating that he had fabricated the allegations against Arnold. *See State of Wisconsin v. Arnold*, Appeal No. 2013AP2538, ¶ 3 (Feb. 11, 2015). (Docket # 14-5.) The circuit court denied the motion and the court of appeals upheld the denial and affirmed the judgment. *Id.* The court of appeals reasoned that the affidavit did not constitute newly discovered evidence as it was cumulative of other evidence presented at trial, including that M.A. had told other people the assaults never happened and that M.A. was not credible. (*Id.* ¶¶ 7–8.) The Wisconsin Supreme Court denied Arnold's petition for review on June 15, 2015. *State v. Arnold*, 2015 WI 78, 865 N.W.2d 502. (Docket # 14-3 at 1.)

On December 21, 2015, Arnold filed a petition for a writ of habeas corpus in this court. (Docket # 1.) On August 16, 2016, I dismissed Arnold's petition as untimely under AEDPA's one-year statute of limitations. (Docket # 17.) I found that under 28 U.S.C. § 2244(d)(1)(A),

2

the one-year clock commenced ninety days after the Wisconsin Supreme Court denied his first petition for review—April 24, 2012—and ended on April 24, 2013. (*Id.* at 3 (citing *Ray v. Clements*, 700 F.3d 993, 1003 (7th Cir. 2012).) I explained that pursuant to 28 U.S.C. § 2244(d)(2), a properly filed application for state post-conviction or other collateral review tolls the limitation period, but Arnold did not file his post-conviction motion until September 16, 2013, months after the deadline for filing a petition for a writ of habeas corpus. (*Id.* at 3–4.) I thus found his petition untimely. (*Id.* at 4.) I further found that the "actual innocence" exception to the statute of limitations did not apply because Arnold could not show that no reasonable juror would have convicted him. (*Id.* at 4–5.) I pointed out that the court of appeals had found that the jury had convicted Arnold despite other evidence that the victim had recanted and was otherwise not credible. (*Id.*)

On appeal, the Seventh Circuit vacated the decision and remanded. *Arnold*, 901 F.3d 830. (Docket # 32.) The court held that an evidentiary hearing was required to determine whether Arnold could meet the standard for allowing an actual innocence claim to proceed to habeas review despite its untimeliness—the "innocence gateway"—under *Schlup v. Delo*, 513 U.S. 298 (1995). (Docket # 32 at 23–24.)

The evidentiary hearing was held in two parts. On February 4, 2019, the court heard the testimony of the victim, M.A—now an adult. (Docket # 42, 43.) On May 13, 2019, the court heard the testimony of an expert witness retained by Arnold, Mark L. Goldstein. (Docket # 52, 55.) Video deposition testimony of Karen B., M.A.'s former juvenile counselor, was also submitted. The parties then submitted post-hearing briefs. (Docket # 58, 56, 59.) I will begin by summarizing the proceedings in Arnold's 2008 trial, and then the testimony given at the evidentiary hearing.

3

**Testimony of M.A. (July 15, 2008)**

M.A. was seventeen years old at the time he testified in the trial of his father, Arnold. (Jury Trial Tr. 198, Docket # 31-2 at 8.)

M.A. testified that in 2004 and 2005, when he was thirteen and fourteen years old, he would often spend weekends at the home of his grandfather, Ronald Hiland, where his father lived. (Jury Trial Tr. 198–202, Docket # 31-2 at 8–12.) M.A. stated that he would do fun things with his father, including four-wheeling, fishing, snowmobiling, and playing video games. (*Id.*) M.A. testified that during these visits, his father would masturbate M.A. and make M.A. masturbate him in the bedroom where he and his father would play video games or watch shows. (Jury Trial Tr. 202–05, Docket # 31-2 at 12–14.) M.A. explained that while the masturbation was happening, "I was a little scared and I was mad because my dad was doing this to me and I was hurt but that is what my mind was feeling but my body was feeling that it felt good." (Jury Trial Tr. 206, Docket # 31-2 at 16.) M.A. testified that he continued to go into the bedroom with his father "[b]ecause I just wanted to do something with my dad that we could do together." (Jury Trial Tr. 208, Docket # 31-2 at 18.) M.A. stated that his grandfather was always in the garages or outside on these occasions. (Jury Trial Tr. 208, Docket # 31-2 at 18.) M.A. stated that this happened on multiple occasions, up to once or twice in a weekend but not every weekend, between fifteen and twenty times in total. (Jury Trial Tr. 207, 209–10; Docket # 31-2 at 17, 19–20.) M.A. acknowledged that he had earlier told an interviewing police officer that it had happened thirty to sixty times. (Jury Trial Tr. 210, Docket # 31-2 at 20.) When asked whether he had noticed anything about his father's genitalia, M.A. indicated that he had not. (Jury Trial Tr. 222, Docket # 31-2 at 32.)

4

M.A. testified that after the assaults, "I was feeling hurt that, you know, my own father would do it to me and I was, you know, sad and I was scared. I just didn't know what to do." (Jury Trial Tr. 206, Docket # 31-2 at 16.) M.A. testified that he did not tell his grandfather what had happened because he did not know how to talk to his grandfather about it and he did not want to see his dad get into trouble. (Jury Trial Tr. 206, 212; Docket # 31-2 at 16, 22.) M.A. explained that he did not tell his mom because he never had a really close relationship with her and did not have a lot of trust. (Jury Trial Tr. 212, Docket # 31-2 at 22.) He thought that if he told her she would "fly off the handle and do something that would end up me losing both of my parents." (*Id.*)

M.A. acknowledged he had initially had some confusion about whether the incidents began occurring in April or May of 2004, but determined the correct month based on Memorial Day occurring in May. (Jury Trial Tr. 216–17, 220–21; Docket # 31-2 at 26–27, 30–31.) M.A. testified that the masturbation stopped in August of 2005, right before he went into eighth grade, for reasons he did not know. (Jury Trial Tr. 210–11, Docket # 31-2 at 20–21.) He felt "relieved but the burden was still there like I still had a feeling it might happen again and it just didn't." (Jury Trial Tr. 211, Docket # 31-2 at 21.)

M.A. admitted to a troubled history: he had been adjudicated delinquent or found guilty of a crime six times previously. (Jury Trial Tr. 198, Docket # 31-2 at 8.) M.A. said that he first disclosed the abuse to a counselor a few months after it stopped, because he had known his counselor for about a year and a half and felt he could trust her. (Jury Trial Tr. 212–13, Docket # 31-2 at 22–23.) He explained that he had had a discussion with another boy who "was in the same situation and we had the same counselor and he told her, and I felt that if he can tell her and nothing would happen out of it, that I could." (*Id.*) He stated that he was

motivated to make the disclosure because it was holding him back and keeping him from getting close to other people. (Jury Trial Tr. 214, Docket # 31-2 at 24.) He explained that he had waited so many months to disclose this information because he was afraid people would think he was gay, and because he just didn't feel comfortable enough. (*Id.*)

M.A. stated that after he disclosed the abuse to his counselor, "I felt that a lot was lifted off my shoulders and I felt that I could open up and tell my counselor more now that we established real trust. I felt that I could progress more with my counseling." (Jury Trial Tr. 214–15, Docket # 31-2 at 24–25.) He stated that he later shared the same information with a law enforcement officer, but felt nervous and awkward talking to the male law enforcement officer, in a way that was different than when he talked to his female counselor. (Jury Trial Tr. 215–16, Docket # 31-2 at 25–26.)

He testified that he never told anyone that the masturbation did not happen or that he lied about it or made it up. (Jury Trial Tr. 217, Docket # 31-2 at 27.) He stated that he was contacted by a defense investigator, but did not talk to that person because he did not feel comfortable enough. (Jury Trial Tr. 217–18, Docket # 31-2 at 27.) He stated that he still loved and cared about his father and he "just wanted to see him get the help he needs to live what you want to call a normal life." (Jury Trial Tr. 218–19, Docket # 31-2 at 28–29.) He stated that he felt very nervous having to talk about this in court, explaining, "My body is just not reacting to this, not in a good way . . . . [b]ecause I am saying things that bring up some pretty bad memories." (Jury Trial Tr. 222, Docket # 31-2 at 32.)

**Testimony of Lisa Masarik**

M.A.'s mother, Lisa Masarik, testified that M.A. did not tell her that Arnold had had sexual contact with him, although she later found out. (Jury Trial Tr. 279, Docket # 31-2 at

6

89.) Masarik confirmed that M.A. would spend most weekends at Hiland's house during the relevant time. (Jury Trial Tr. 280, Docket # 31-2 at 90.) She stated that she would not have let M.A. continue to go to Hiland's if she knew Arnold was having sexual contact with M.A., and that M.A. would have known that. (Jury Trial Tr. 282, Docket # 31-2 at 238.) Masarik testified that M.A. eventually talked to her about it and described masturbation, but would not go into detail due to embarrassment. (Jury Trial Tr. 283, Docket # 31-2 at 93.) Masarik stated she knew M.A. was embarrassed because he would not look her in the eye when she asked him questions. (Jury Trial Tr. 283–84, Docket # 31-2 at 93–94.) Masarik described both animosity and affection in her relationship with M.A., and explained that they currently avoided each other. (Jury Trial Tr. 285, Docket # 31-2 at 95.) She stated that M.A. was currently upset with and angry at his father. (Jury Trial Tr. 287, Docket # 31-2 at 97.) She also stated that M.A. had told her in the past that he had been upset when his father had left him at Hiland's to go off and do other things. (Jury Trial Tr. 293–94, Docket # 31-2 at 103–04.)

**Testimony of Detective Tom Mukarat**

Detective Tom Mukarat testified that their department had received a phone call from a social worker informing them that there was a possible sexual assault in their county. (Jury Trial Tr. 307, Docket # 31-2 at 117.) He explained that M.A. told him he had been sexually assaulted by his father at his grandfather's house. (Jury Trial Tr. 309, Docket # 31-2 at 119.) He indicated that M.A. originally said the assaults started in April 2004 but later said Memorial Day weekend 2004, which would have been in May. (Jury Trial Tr. 313–14, Docket # 31-2 at 123–24.) Mukarat said children do not usually remember specific dates. (*Id.*)

Mukarat testified that he asked M.A. if he knew how many times the assaults had occurred, but M.A. could not remember; Mukarat then calculated that with sixty-four weekends in the relevant period and visits with M.A.'s father occurring most but not all weekends, it might have been between thirty-two and sixty-four times. (Jury Trial Tr. 375–76, Docket # 31-2 at 185–86.) M.A. had confirmed that that was an acceptable range, but he did not know the specific number. (Jury Trial Tr. 376–77, Docket # 31-2 at 186–87.) Mukarat stated that M.A. later told him that he didn't tell anyone because he enjoyed spending time with his father, and that M.A wanted his father to get some help. (Jury Trial Tr. 380–81, Docket # 31-2 at 190–91.) He stated that M.A. did not seem angry during the interview. (Jury Trial Tr. 382, Docket # 31-2 at 192.) Mukarat confirmed that in his experience it was common for victims to remember more details after the initial interview, especially children. (Jury Trial Tr. 383, Docket # 31-2 at 193.) During Mukarat's second interview with M.A., M.A. told him he had disclosed to his counselor, but not to his mother, because he thought his mother would be upset with Arnold. (Jury Trial Tr. 391–92.)

Mukarat also stated that he spoke with Arnold about the accusations and Arnold did not appear angry; he just denied any involvement. (Jury Trial Tr. 386–87, Docket # 31-2 at 197.) Mukarat testified that Arnold told him he had never been alone with M.A. at the residence. (*Id.*) He mentioned that Hiland, his mother Vivian Arnold, and his girlfriend Misty Frank could verify the information. (Jury Trial Tr. 388, Docket # 31-2 at 198.)

**Testimony of Beth Huebner**

The jury heard the testimony of Dr. Beth Huebner, a clinical psychologist specializing in forensic psychology with expertise in working with abused children, including adolescents. (Jury Trial Tr. 317–71, Docket # 31-2 at 127–81.) Huebner had never met M.A. or spoken to

8

anyone else in his family, and was not offering a formal evaluation or opinion; she was only sharing what the research showed about the behaviors of victims of sexual assault. (Jury Trial Tr. 354–55, Docket # 31-2 at 164–65.)

Huebner stated that a thirteen-, fourteen-, or fifteen-year-old male is generally very sexually aware and acutely sexually focused. (Jury Trial Tr. 337, Docket # 31-2 at 147.) Huebner testified that a teenager might have a certain physical reaction to sexual abuse that differs from their mental reaction, explaining that even when a person is being sexually abused, their body can respond to it, especially if the perpetrator is good at "grooming," i.e. getting the adolescent entrenched in their relationship. (Jury Trial Tr. 337–38, Docket # 31-2 at 147–48.) Huebner stated that some adolescents may continue to have a relationship with the alleged perpetrator for a considerable period of time until the disclosure ends that relationship. (Jury Trial Tr. 336, 343; Docket # 31-2 at 146, 153.)

Huebner testified that—in contrast to young children, who might disclose sexual abuse unintentionally—teenagers tend to make what are called "purposeful disclosures" to a peer, parent, or trusted figure, "someone that they feel they can talk to." (Jury Trial Tr. 327, Docket # 31-2 at 137.) She explained that adolescents will weigh the consequences of disclosing or not disclosing. (Jury Trial Tr. 328, Docket # 31-2 at 138.) Huebner indicated that studies show that male teenagers are more reluctant to disclose than females, because boys tend not to talk as much about feelings and they are also afraid of being ridiculed or considered gay. (Jury Trial Tr. 329, Docket # 31-2 at 139.) Huebner indicated that another reason an adolescent might find it difficult to disclose is the adolescent's awareness of the possible implications for the family: "Is it going to tear the family apart, is it going to have them have less access to other important people in their lives[?]" (*Id.*) Huebner also stated that victims of both genders

9

sometimes feel responsible for the abuse and will not disclose due to feelings of guilt or shame. (Jury Trial Tr. 329–30, Docket # 31-2 at 139–40.) Additionally, Huebner testified that a person may still love or have a strong attachment to the perpetrator, and an older child would be concerned about losing that relationship: "They want the relationship; they don't want the sexual aspect of the relationship so it becomes complicated particularly if it is a very close family member such as a father or grandfather or very close uncle." (Jury Trial Tr. 330–31, Docket # 31-2 at 140–41.)

Huebner testified that a teenage male might disclose sexual assault if he finds someone he feels comfortable disclosing it to or if he has been doing a lot of thinking about it and then an opportunity to disclose presents itself. (Jury Trial Tr. 329, Docket # 31-2 at 139.) Huebner explained that "oftentimes whether it is through therapy or having confidential talks with their peers or whatever, but suddenly finding somebody who feels safe to them they may choose to disclose." (Jury Trial Tr. 333–34, Docket # 31-2 at 143–44.) She stated that it could be a peer, a therapist, a school counselor, or a favorite aunt. (Jury Trial Tr. 334, Docket # 31-2 at 144.) Huebner stated that in the research and her own experience, where the alleged abuse is within the family, adolescents tend to disclose first to someone outside the family. (Jury Trial Tr. 334–35, Docket # 31-2 at 144–45.) She explained that disclosing to a family member may put that person in a position of choosing to believe one family member over another, and that talking about sexual issues can feel more comfortable with someone who is not a parent. (Jury Trial Tr. 335, Docket # 31-2 at 145.) Huebner summarized the process of disclosure for a teenager as thinking about it, finding a safe person, and disclosing to a safe person. (Jury Trial Tr. 335–36, Docket # 31-2 at 145–46.) Huebner confirmed that a child generally

discloses to someone outside law enforcement before they disclose to law enforcement. (Jury Trial Tr. 361, Docket # 31-2 at 171.)

Huebner stated that depending on the circumstances, an individual might disclose within a few months or with a several-year delay, or not at all. (Jury Trial Tr. 331–32, Docket # 31-2 at 141–42.) Huebner indicated that some studies tentatively show that if the abuser is a family member, the disclosure process is more difficult and there tends to be a greater delay. (Jury Trial Tr. 330–31, Docket # 31-2 at 140–41.)

Huebner explained further that for the majority of teenagers, the disclosure of sexual abuse is not an event but a process, "meaning that somebody may tentatively talk about having been sexually abused but they may not give all of the details at that point either because they have been trying to forget them or because they are too embarrassed to give the details or they just kind of want to get started in terms of the disclosure process." (Jury Trial Tr. 338–39, Docket # 31-2 at 148–49.) She explained that when abuse spans a long period of time, it is very difficult for a victim to remember the exact number of times the abuse happened or the specific details; "one tends to be more focused on the fact that the alleged abuse did occur." (Jury Trial Tr. 339, Docket # 31-2 at 339.) She stated that in most cases it is only over a period of time that they able to give a very clear picture of the abuse. (Jury Trial Tr. 340, Docket # 31-2 at 340.) She also clarified that the more opportunity a person has to talk about their sexual abuse, the more specific they may be and the clearer their recollection may become, such that some details might be inconsistent over time. (Jury Trial Tr. 346–47, 365; Docket # 31-2 at 157, 175.) For example, Huebner explained that a person who is asked how many times the abuse happened may not have thought about the number of times when first asked, so later estimates will be different than initial ones as the person has time to try to work

11

through the numbers, for example by calculating how many times it happened per week. (Jury Trial Tr. 364, Docket # 31-2 at 174.) Huebner testified that inconsistent or incomplete information does not indicate that the person is being untruthful:

> [A]s people have more time to think about particular details, they may remember something. I think it is important to remember that one of the things that happens with sexual abuse is that people try to compartmentalize it, they try to forget about it, they try to put it over here so it is not there on a daily basis, and you almost have to do that in order to function at any particular level so because you [have] learned to compartmentalize that particular behavior, there is kind of a reluctance to bring it out but the more you have to think about it, the more it seems that the details from that compartmentalization come clearer to you.

(Jury Trial Tr. 366–67, Docket # 31-2 at 176–77.)

Huebner testified that only a small minority of people who have truly been the victims of abuse would recant their allegations. (Jury Trial Tr. 348, Docket # 31-2 at 158.) Such a recantation would likely be due to "pressure from someone or an awareness of the consequences of having disclosed." (Jury Trial Tr. 347, 360; Docket # 31-2 at 157, 170.) Huebner described cases from research and her own experience where a family has tried to pressure a child to recant allegations of sexual abuse. (*Id.*) She explained,

> There [are] a lot of vested interests in not having that be true, and what we often find in the percentage of people who, children or adolescents who did recant, it generally is in response to some very strong statements from people about the damage that they are doing to a person, the damage that they are doing to the family, from friends who are saying, you're weird if you go ahead with this, et cetera. So there is a certain percentage of people who will recant but reaffirm. A small percentage but there are some.

(Jury Trial Tr. 340–41, Docket # 31-2 at 150–51.)

**Testimony of Randi Shaw**

Randi Shaw testified that she was Arnold's ex-wife but maintained a good relationship with Arnold after their 2003 divorce, spending time with him in 2004 and 2005 at both her

12

residence and Hiland's. (Jury Trial Tr. 441–42, 47; Docket # 31-3 at 18–19, 24.) Shaw never saw M.A. at Hiland's house during that time period because she was there on weekdays and M.A. visited on weekends. (Jury Trial Tr. 443, Docket # 31-3 at 20.) Shaw testified that Arnold had piercings on his genitalia and a tattoo on his hip, and he would only take the piercings off to change them. (Jury Trial Tr. 444–45, Docket # 31-3 at 21–22.) She indicated that a person would feel the piercings if they touched Arnold's genitalia. (Jury Trial Tr. 445, Docket # 31-3 at 22.) Shaw confirmed that a photograph depicted Arnold's pierced genitalia as it looked around June 2004. (Jury Trial Tr. 452–56, Docket # 31-3 at 29–33.)

**Testimony of Rodney Allen Gruse, Jr.**

Rodney Gruse, Randi Shaw's son, testified that he would go to Hiland's home once or twice a week in the relevant time period to participate in outdoor activities. (Jury Trial Tr. 457–58, Docket # 31-3 at 34–35.) He testified that he saw M.A. there frequently, and never found Arnold and M.A. alone and never saw M.A. act in a way that made him suspect anything inappropriate might be occurring. (Jury Trial Tr. 460–62, Docket # 31-3 at 37–39.) Gruse admitted he never stayed overnight. (Jury Trial Tr. 465, Docket # 31-3 at 42.)

**Testimony of Stephanie Winter**

Arnold's friend Stephanie Winter indicated that she spent time with Arnold at the Hiland residence between May 2004 and August 2005 and saw M.A. there, along with a number of other people. (Jury Trial Tr. 471–72, Docket # 31-3 at 48–49.) Winter stated that she never came across Arnold alone with M.A. (Jury Trial Day 3 at 477, Docket # 31-3 at 54.) She confirmed that M.A. and Arnold seemed to get along and she saw nothing unusual or inappropriate about their relationship. (Jury Trial Tr. 473, Docket # 31-3 at 50.) Winter indicated that the adults would usually go out Thursday, Friday, and Saturday nights between

13

8:00 and 9:00 p.m. and stay until bar close at 2:15 or 2:30 a.m., after which they would go back to Hiland's, where she would sleep in a tent in the backyard with Arnold, who never got up to go inside the residence for any length of time. (Jury Trial Tr. 475–76, 484–85; Docket # 31-3 at 52–53, 61–62.) She indicated that she stayed in the tent with Arnold even in the winter. (Jury Trial Tr. 480, Docket # 31-3 at 57.) Winter confirmed that she had intimate relations with Arnold during the relevant time period, but that "Misty" was Arnold's girlfriend at the time and that Misty would spend nights at the Hiland residence sometimes. (Jury Trial Tr. 481, 489; Docket # 31-3 at 58, 66.) Winter confirmed that she had seen Arnold's pierced genitalia and tattooed hip during the relevant time period and identified photographs as pictures of Arnold's genitalia. (Jury Trial Day 3 at 478–79, Docket # 31-3 at 55–56.)

### Testimony of Phillip Lawrence Augsburger

Phillip Augsburger testified that he had been Arnold's friend for about four and a half years and had gone to Hiland's residence to hunt, fish, cut firewood, and work on vehicles. (Jury Trial Tr. 497–98, Docket # 31-3 at 74–75.) He stated that he would see M.A. there once in a while, but never saw Arnold off alone with M.A. or any inappropriate contact between them. (Jury Trial Tr. 498–99, Docket # 31-3 at 75–76.) Augsburger recalled that Arnold stayed in the tent with his girlfriend, Winter. (Jury Trial Tr. 499–500, Docket # 31-3 at 77.) Augsburger stated that he and Arnold were best friends and the only time they were not together was when they were sleeping. (Jury Trial Tr. 503, Docket # 31-3 at 80.) Augsburger later acknowledged that he never stayed overnight at Hiland's and there were, in fact, times they were not together. (Jury Trial Tr. 511–13, Docket # 31-3 at 88–90.)

14

Augsburger testified that after M.A.'s accusations against Arnold, he asked M.A., "[D]id this really happen between you and your father[?]" and M.A. answered, "No, it did not." (Jury Trial Tr. 505, Docket # 31-3 at 82.) Augsburger stated that he then asked M.A. why he said it had happened, and M.A. said he was mad at his father. (Jury Trial Tr. 506, Docket # 31-3 at 83.) Augsburger testified that M.A. told him he had tried to tell his mother and a social worker that it did not happen but "they won't listen to me. They think I'm lying." (*Id.*) Augsburger told M.A. he would pick him up and take him to someone who would believe him in town, but in fact, Augsburger never brought it up again with M.A. (Jury Trial Tr. 506–08, Docket # 31-3 at 83–85.) Augsburger said he tried to contact M.A. by text message and phone calls but M.A. never returned them. (Jury Trial Tr. 515, Docket # 31-3 at 92.) He never reported M.A.'s recantation to the police, the prosecutor's office, or M.A.'s mother, and explained that he did not know whom to contact. (Jury Trial Tr. 516, Docket # 31-3 at 93.)

Augsburger admitted that he had been convicted of a crime four times. Augsburger also admitted that he did not remember dates well and the things he testified to could have happened before or after 2004 or 2005. (Jury Trial Tr. 512, Docket # 31-3 at 89.) Augsburger also confirmed that he had told an investigator that he would not want to see anything happen to Arnold. (Jury Trial Tr. 518, Docket # 31-3 at 95.)

**Testimony of Lila Mae Behm**

Behm, Arnold's aunt and M.A.'s great-aunt, testified that in the summer of 2006 she was sitting outside her house with M.A. and his grandmother, Vivian Arnold (Behm's sister). She testified that M.A. said that "nothing happened," which she understood to mean that nothing had happened with his dad. (Jury Trial Tr. 523, Docket # 31-3 at 101.) Behm explained that Vivian asked M.A. if he had called the defense investigator, and M.A. said he

was trying to call but never got an answer. (Jury Trial Tr. 521–22, Docket # 31-3 at 98–99.) Behm testified that she asked M.A. if he would go see the investigator if she went with him, and M.A. said yes. (Jury Trial Tr. 523, Docket # 31-3 at 100.) Behm stated that she made the appointment, but M.A. called to tell her he could not make it because he had a doctor's appointment. (*Id.*) She indicated that she knew M.A. had been reluctant to contact the defense investigator and never went to the appointments family members set up because he always had something else to do. (Jury Trial Tr. 528, Docket # 31-3 at 105.) Behm never made any attempts to contact the police or anyone else to ask if someone could come talk to M.A, and only disclosed to anyone that M.A. had made the alleged statement within the month before trial. (Jury Trial Tr. 528, 531, 536, Docket # 31-3 at 105, 108, 113.) Behm indicated that she did not know of anyone to contact other than the defense investigator, and she felt it needed to be M.A. who told him. (Jury Trial Tr. 531, Docket # 31-3 at 108.)

Behm explained that she had helped Vivian raise Arnold when he was little and that Vivian had lived with Behm for about two years and still lived with her at the time of the trial. (Jury Trial Tr. 525–26, Docket # 31-3 at 102–03.) Behm denied that anyone in the family treated M.A. differently after he made these allegations and that she did not see that anyone was upset with M.A. about the allegations. (Jury Trial Tr. 532, Docket # 31-3 at 109.)

**Testimony of Ronald Hiland**

Hiland testified that he was M.A.'s grandfather and saw M.A. two or three times a month. (Jury Trial Tr. 546–47, Docket # 31-3 at 123–24.) He testified that when Arnold lived with him, M.A. would visit on weekends. (Jury Trial Tr. 547–48, Docket # 31-3 at 124–25.) Hiland confirmed that Arnold had a bedroom at his house, and explained that Hiland slept on the living room couch and M.A. slept in a chair next to Hiland. (Jury Trial Tr. 549, Docket

16

# 31-3 at 126.) Hiland stated that there were video games in the living room. (Jury Trial Tr. 550, Docket # 31-3 at 127.) Hiland denied that M.A. ever came to him and said anything bad was happening to him. (Jury Trial Tr. 551, Docket # 31-3 at 128.) Hiland remembered that Arnold had a tent set up in the backyard, but could not recall for sure if Arnold routinely stayed out in the tent. (Jury Trial Tr. 551, 558; Docket # 31-3 at 128, 135.) Hiland admitted that he did not remember the time frame or the years when Arnold lived with him, stating, "I can't keep track of dates." (Jury Trial Tr. 552–53, Docket # 31-3 at 129–30.) At one time the weekends were M.A. and Arnold's time together; however, "there were so many dates and so many things screwed up, I can't remember." (Jury Trial Tr. 557–58, 460, Docket # 31-3 at 134–35, 137.)

Hiland agreed that there were times when Arnold was living with him that each of them would do their "own thing." (Jury Trial Tr. 553, Docket # 31-3 at 130.) He indicated that he liked to make his own gun barrels and work on cars in the shop during the day. (*Id.*) He confirmed that sometimes Arnold and M.A. would spend time together inside the house, including playing video games and watching TV. (Jury Trial Tr. 555–56, Docket # 31-3 at 132–33.) Hiland indicated that there might have been times when M.A. and Arnold were alone together in the house, and agreed that he [Hiland] spent a lot of time working out in the garage for an hour or longer. (Jury Trial Tr. 556–57, 562; Docket # 31-3 at 133–34, 139.)

**Testimony of Richard Arnold**

Arnold testified that he lived with his stepfather, Hiland, in or around May 2004. (Jury Trial Tr. 564–65, Docket # 31-3 at 141–42.) He testified that he had a bedroom at the residence but was an "outdoors person" and did not spend much time there. (Jury Trial Tr. 565, Docket # 31-3 at 142.) He explained that M.A. would come to Hiland's house every

17

other weekend and Hiland would always be at the residence if M.A. was there. (*Id.*) He stated that M.A.'s mother did not allow M.A. to spend time away from the residence with Arnold if Arnold was with his girlfriend, and that he never took M.A. with him if he left the residence at the time he was dating Misty. (Jury Trial Tr. 566, Docket # 31-3 at 143.) He indicated that there were times in the relevant time period when he would leave M.A. at the residence to go to work, fishing, or hunting, etc. (*Id.*) Arnold testified that it was common for his friends to come over during the week and on weekends. (Jury Trial Tr. 570–71, Docket # 31-3 at 147–48.) He stated that they worked on a lot of vehicles and went four-wheeling, fishing, hunting, etc., but M.A. only seldomly participated in these activities. (Jury Trial Tr. 571, Docket # 31-3 at 148.) He stated that he enjoyed it when his son participated and loved his son very much. (*Id.*) However, he stated that most of the weekends M.A. was there he wouldn't be with M.A. because he was working, hunting, fishing, and doing things with his friends. (Jury Trial Tr. 579–80, Docket # 31-3 at 157.) He confirmed that he knows M.A. loves him and wants to spend time with him. (*Id.*)

Arnold indicated that there were times when M.A. would become upset with him because he could not afford to buy him videos or video games and M.A. asked him why he couldn't buy him anything but grandpa could. (Jury Trial Tr. 577, Docket # 31-3 at 154.) Arnold stated that this was prior to the May 2004–August 2005 timeframe of the alleged assaults. (Jury Trial Tr. 591–92, Docket # 31-3 at 168–69.)

Arnold testified that during the relevant time he was working through a temp service and for a tree service owned by Augsburger. (Jury Trial Tr. 566–67, Docket # 31-3 at 143–44.) He worked weekdays and sometimes on weekends. (*Id.*) Arnold indicated that even when he worked for the temp service he usually worked with Augsburger because Augsburger did

not have a driver's license at the time, and they would be gone most of the day. (Jury Trial Tr. 567, Docket # 31-3 at 144.) Arnold indicated that he would go out socially with friends every Thursday, Friday, and Saturday evening and would stay until the bar closed. (Jury Trial Tr. 567–68, Docket # 31-3 at 144–45.)

Arnold stated that Winter would spend the night in his tent in the backyard, which had a TV, heater, radio, a blanket, a pillow, and clothes. (*Id.*) He confirmed that at some point it snowed while he was out in the tent. (Jury Trial Tr. 569, Docket # 31-3 at 146.) Arnold admitted that he did not stay out in the tent all winter, and that there would have been times in the relevant period when he would have slept in his room in the house. (Jury Trial Tr. 593, Docket # 31-3 at 170.) He stated that during this time frame he was separated from Misty, who was staying with someone else. (*Id.*)

Arnold denied calling M.A. into the bedroom and testified that he never had any sexual contact with his son. (Jury Trial Tr. 571–72, 578–79; Docket # 31-3 at 148–49.) He stated that he did not like M.A. to be in his room; he admitted that he had a television in his room but testified that he never sat in his room alone with M.A. to watch television. (Jury Trial Tr. 575, Docket # 31-3 at 152.) He stated that there were no video games in his room; they were in the living room. (Jury Trial Tr. 576, Docket # 31-3 at 153.) Arnold testified that if M.A. wasn't playing video games he would tag along with Arnold and Hiland to do things like make gun barrels and work on vehicles. (Jury Trial Tr. 577–78, Docket # 31-3 at 154–55.) He testified that there was no occasion from May 2004 to August 2005 for him to be in Hiland's house alone with M.A. (Jury Trial Tr. 581, Docket # 31-3 at 158.) Arnold indicated that his son always slept in the living room on a chair, with Hiland on the couch nearby. (Jury Trial Tr. 578, Docket # 31-3 at 155.) Arnold testified that if Hiland would go into town, he

19

would go with him, and M.A. would go if he was there. (*Id.*) Arnold continued to live at Hiland's residence beyond August of 2005. (Jury Trial Tr. 597, Docket # 31-3 at 174.) Arnold stated that Hiland was rarely in the garage alone. (*Id.*)

Arnold stated that his son's accusations hurt him a lot. (Jury Trial Tr. 572, Docket # 31-3 at 149.) He testified that he was shocked by the allegations and told the detective several times that he did not do it. (Jury Trial Tr. 573, Docket # 31-3 at 150.) He admitted that he became upset with the detective and swore at him, explaining that "he kept telling me that I wasn't telling him the truth. He kept trying to get me to say something that I wasn't going to tell him. I didn't do anything." (Jury Trial Tr. 574, Docket # 31-3 at 151.)

Arnold confirmed that he had watched his son testify and had seen him show very little emotion. (Jury Trial Tr. 594, Docket # 31-3 at 171.) He stated that there have been times in his son's life when he has seen him exhibit emotion, and they were not anything like what he saw in court. (Jury Trial Tr. 598, Docket # 31-3 at 175.) Arnold admitted that it had been approximately two years since he had talked to his son, but stated that he knew his son well enough to know exactly what M.A. was feeling while testifying. (Jury Trial Tr. 599–600, Docket # 31-3 at 176–77.) As for his own emotions, Arnold testified that there were times during the trial when he turned his head away from the jury because he had tears in his eyes. (Jury Trial Tr. 597–98, Docket # 31-3 at 174–75.) Arnold indicated that he had an emotional reaction watching his son testify, but had held it back. (Jury Trial Tr. 594–95, Docket # 31-3 at 171–72.) He indicated that he himself was having an emotional reaction on the stand because it was more emotional for him to talk about it than to listen to his son talk about it. (Jury Trial Tr. 595, Docket # 31-3 at 172.) Arnold stated that it was more emotional for him than for his son. (Jury Trial Tr. 600, Docket # 31-3 at 177.)

Arnold admitted that he had been convicted of a crime five times. (Jury Trial Tr. 579, Docket # 31-3 at 156.) Arnold had been incarcerated for part of the relevant period, from July 7, 2004 to October 29, 2004. (Jury Trial Tr. 568, Docket # 31-3 at 145.) Arnold confirmed that he had genital piercings throughout the relevant time period and it was his habit to keep them in. (Jury Trial Tr. 570, Docket # 31-3 at 147.)

## EVIDENCE FROM FEDERAL HABEAS PROCEEDINGS

### The Affidavit

In his November 3, 2011 affidavit, M.A. states that the charges against his father are false and they did not have sexual contact. He felt pressured into accusing his father; if he did not, he would not have completed his counseling and gotten out of treatment. Additionally, his father's probation officer pushed him because his father had given him condoms and the probation officer put him in jail for that and said Arnold was not a good father. M.A. states, "I just want everyone to know that this was all a big mistake and it was not true. I made the mistake of lying about this and it cost all of us a lot. I hope you can help get my dad out of prison so he can come home where he belongs. He has been locked up long enough for something that he didn't do." (Evidentiary Hearing (Feb. 4, 2019) Ex. 1).

### Evidentiary Hearing

#### Testimony of M.A.

M.A., who was twenty-eight years old at the time of the evidentiary hearing in 2019 (Evidentiary Hearing (Feb. 4, 2019) Tr. at 5, Docket # 43), testified that his counselor had pressured him into fabricating the allegations of sexual assault, and that his recantation affidavit of 2011 was true.

21

M.A. explained that he was on juvenile supervision from 2006 until 2007 or 2008, which involved a mandatory counseling program called Kids In Treatment ("KIT") for juveniles deemed to have committed a sexual offense. (*Id.* at 12–13, 51.) He recalled that he worked with a social worker and also with a therapist named Karen. (*Id.* at 13.) M.A. stated that he met with Karen once or twice weekly to address his aggression issues as well as the sexual offense he had allegedly committed. (*Id.* at 14.) M.A. explained that Karen had "power to pretty much do whatever she wanted with [his] life." (*Id.* at 63.) He stated that she had caused him to be placed in custody "a lot" before he made the allegations against his father. (*Id.*) M.A. stated that Karen would call his social worker while he was sitting in her office, and he was then put on "holds" from 72 hours to 180 days. (*Id.* at 15, 60, 63.) M.A. testified that Karen had caused him to be taken into custody for "anything from I didn't do an assignment she asked me to do to I was five minutes late to a session." (*Id.* at 70.) M.A. gave an example of an occasion on which he admitted to Karen that he had gone to a house party and within twenty minutes his social worker had shown up and taken him into custody. (*Id.* at 71.)

M.A. confirmed that he was having problems on his juvenile supervision before he made the allegations about his father, including a "very big problem with fighting." (*Id.* at 61–64.) He also sometimes stayed at his girlfriend's house in violation of his probation. (*Id.* at 42–43.) He admitted to "normal" teenage behavior such as having a drink at a party. (*Id.* at 62.) He stated that several times he tried to be comfortable telling his counselor these things, which were violations of his probation, but he ended up in jail. (*Id.*) M.A. testified that it was hard to keep track of how many times he was incarcerated but that it could be described as "very" routine. (*Id.* at 63–64.) When asked if there was ever a time that Karen put him in

custody for just saying something, as opposed to an action he had done, M.A. stated that in his opinion, it was pretty much every time. (*Id.* at 71.) M.A. stated that there was a point where he had told Karen he no longer wanted to be in that program and he was incarcerated two days later without any charges brought against him or reason given, though he couldn't say it was directly related. (*Id.* at 71–72.)

M.A. testified that he disclosed the sexual assault by his father to Karen during the course of his work with her. (*Id.* at 13, 15.) M.A. could not recall how many times he met with Karen before this, but it was not the first time he met with her. (*Id.* at 14–15.) M.A. testified that Karen planted the idea or pushed him to say that his father sexually assaulted him. (*Id.* at 30, 43.) M.A. explained that he had been in a group session with Karen discussing sexual assault, and part of the assigned coursework was to write a story. (*Id.* at 43–44, 64–65.) M.A. could not remember why they were asked to write a story or exactly what the requirements for the story were, only that it was one of the steps of the program. (*Id.*) M.A. stated that he wrote a very detailed, vivid story about a sexual assault of a child by a parent. (*Id.*) M.A. testified that he came up with the story "completely out of the blue"; "[i]t all just kind of poured right out of my head." (*Id.* at 24–25.) M.A. denied that the story he wrote named his father or himself or anyone else discussed in the hearing, or that it was about himself, stating that it was all fictional. (*Id.* at 64.) M.A. explained that he was very sexually active as a teenager and had a lot of experience with people in different types of sexual activity from the age of about eleven onward. (*Id.* at 25.) M.A. explained that part of the reason he was on supervision was for a sex offense. (*Id.*)

M.A. stated that he was with Karen when she read the story. (*Id.* at 65.) M.A. testified that Karen took his story as though it had actually happened, and she pulled it into one of

their individual sessions and "pushed it into my head that it actually happened." (*Id.* at 44–45.) He stated that Karen "made my story seem like something sexually had happened to me," when in reality he could just write a good story. (*Id.* at 14.) M.A. explained that Karen started asking questions, "Just normal basic questions at first, and then she pushed it onto did something like this happen? This is very thorough and vivid and realistic." (*Id.* at 65–66.) He explained that the counselor had brought it up several times, and then they moved on, and then in one private session with his counselor she returned to the story and "she just dove head on into it right away" and was very "adamant"; she "just slam[med] head on with, you know, I know this happened to you, nobody writes something like this. In all my years I've seen something like this, thorough and vivid." (*Id.* at 66–67.) M.A. stated that he fought with the counselor for approximately the first half hour of the session about it. (*Id.*) M.A. testified that "she just pushed it towards him so much that I wanted her to just shut up and leave me alone, so I gave her what she wanted to hear basically." (*Id.* at 15.) M.A. stated that Karen kept "hinting towards it throughout the session," and then she cancelled her next appointment to continue talking with him, "[a]nd the more she hinted and the way she was wording things, that it kind of manipulated my brain into saying exactly what she wanted to hear so she would get off my back basically." (*Id.* at 30–31, 45.)

M.A. confirmed that he discussed his father assaulting him over several sessions with Karen. (*Id.* at 65–66, 72.) He explained that he did not remember each session individually; "[i]t was more she just wanted to get as many details out of me as she possibly could." (*Id.*) M.A. explained that Karen asked him different scenarios about the nature of the sexual assault, "[W]as it this that happened, was it this that happened, was it this that happened? And I just picked one, and so she would – I wanted her to basically shut up and leave me

24

alone." (*Id.* at 47.) M.A. stated that Karen had been pushing toward his father having done something to him, and "finally she just pushed it to where I said, yeah, so she'd get off my back." (*Id.* at 13.) M.A. stated that he did not remember very much of the content of the discussion he had with Karen about the sexual assault. (*Id.* at 45.) M.A. testified that he went into detail with Karen about how, where, and how often/how many times the sexual assaults by his father happened. (*Id.* at 46.) He did not remember telling his counselor any number of times the assaults happened to him or how he came up with the number; "it was just [a] spit it out kind of thing." (*Id.* at 68.)

M.A. testified that he fabricated the allegations out of fear that Karen would cause revocation of his juvenile supervision. M.A. stated that, at the time he made the allegations against his father, he was "at that point where if I got in any more trouble with [Karen], I was facing revocation by a judge . . . and then I would have to sit all the previous time that I was already on plus what I had remaining." (*Id.* at 60–61.) M.A. explained, "My biggest fear is she was going to make my life hell to the point where I was going to end up being revoked." (*Id.* at 61.) M.A. added, "[A]ny little thing that I didn't do that was supposed to be done, I felt because she already pushed so much off of, you know, that I did wrong to my social worker to the point where it got to where I couldn't feel comfortable to talk to her about anything after that to where I was afraid she was going to turn it around, and I was going to end up in jail." (*Id.*) M.A. explained that revocation would have meant five years of incarceration, partially in a juvenile correctional facility and then an adult facility. (*Id.* at 15–16.) M.A. testified that he had not wanted to go to prison and had wanted to finish his juvenile supervision. (*Id.* at 16.) When asked what he thought would have happened if he had come forward and said nothing like that ever happened to him, M.A. stated, "While I was on paper,

25

my biggest fear was the revocation." (*Id.* at 67.) M.A. explained that his counselor was a very persistent person, and at that point, he was afraid to not give her what she wanted or what she was seeming to want him to say. (*Id.*) When shown his recantation affidavit, M.A. confirmed that the "pressure" he spoke of was his counselor steering him towards accusing his father of sexual assault. (*Id.* at 30.)

M.A. testified that Karen was "targeting" his father because Karen blamed Arnold for some of M.A.'s problems, like his acting out, and viewed Arnold as a bad influence. (*Id.* at 14.) M.A. explained that he and his father did not have a healthy relationship historically, and Karen viewed Arnold as a "very horrible person" and targeted him for anything that was going on with M.A. (*Id.* at 43.) M.A. stated that he believed if he did not say his father sexually assaulted him, Karen would have found a way to revoke him and put him in jail. (*Id.* at 45.) When asked if it would have satisfied Karen and he would not have been revoked if he had said it was his grandfather who sexually assaulted him, M.A. stated he believed it would have, but she was pushing towards Arnold so much that he just gave her what he understood she wanted to hear. (*Id.* at 45–46.)

M.A. acknowledged that the affidavit contains a statement that his father's probation officer ("PO") also pushed him. (*Id.* at 31.) M.A. testified that his father's probation officer was upset with Arnold for giving M.A. condoms before he disclosed the sexual assault. (*Id.*) M.A. explained that the probation officer "had to find out what was going on with him," and "she had just asked about it, and to me that was pushing on her end as well" after he disclosed the abuse to Karen. (*Id.* at 31, 48.) He stated that the probation officer did not tell him what to say, but he felt pressured because she was a very intimidating person in general, so "anything she asked me, I just went along with." (*Id.* at 48.)

M.A. also testified that he had wanted to spend more time with his father during the time period of the alleged assaults—May 2004 to August 2005—but he was not able to because his father was always with his girlfriend Misty and her child. (*Id.* at 31–33.) M.A. stated that he was not aware that his father testified at trial that he was no longer seeing Misty at the time of the accusations, that his grandfather testified at trial that Misty was not allowed to spend the weekends at the residence while M.A. was there, or that Stephanie Winter testified at trial that she was his father's girlfriend at the time and she had only seen Misty at the residence once or twice during that time period. (*Id.* at 33.)

M.A. testified that after he disclosed the abuse to Karen, Karen called his mother and then the police department and social services. (*Id.* at 15, 49, 67–68.) He stated that after this, he no longer trusted Karen and did the bare minimum to "keep her off my back." (*Id.* at 68.) M.A. stated that his counselors did not talk much about the incidents after the original disclosure. (*Id.* at 15.) M.A. stated that his mother was not upset with him about the allegations. (*Id.*) He testified that the reaction from other family members to his allegations "wasn't always a positive one," especially from the relatives on his father's side. (*Id.* at 49– 50.) M.A. stated that he stopped getting invited to a lot of things and he "became the red-headed stepchild of the family for awhile." (*Id.* at 50.) He also stated that he had distanced himself from the family during that period. (*Id.*)

M.A. confirmed that he was worried about negative consequences of admitting that he had lied. (*Id.* at 26, 40.) He explained that on top of probable revocation of his juvenile probation, which he thought would result in going to prison, he worried about criminal charges. (*Id.* at 40–41.) He stated that he got off juvenile probation in 2007 or 2008, a few years before he signed the affidavit, and was no longer involved in the KIT program, but had

one other adult charge with a penalty of one year on adult probation. (*Id.* at 25–26.) When asked if he ever admitted to the family that he lied, he stated that he thought about it, but "I was still being selfish and looking out for myself and not kind of caring about what everybody else had going on." (*Id.* at 50.) M.A. explained that when he was growing up, he had the attitude of "I'm going to do this to benefit myself no matter . . . who got in my way or who got hurt. And then after all this, it started to change my way of thinking because I realized I wasn't just hurting acquaintances anymore, I was hurting and losing my whole family. And once I was finally released from everything to where I was just on the adult probation . . . I knew it was okay for me to finally relax and, you know, my life was no longer on the line even though I risked -- You know, I put his life on the line." (*Id.* at 50–51.) When asked if, at the point he started to relax and know that his life was no longer on the line, he came forward to admit that he lied about his father, M.A. replied that he did not do so right away. (*Id.* at 51.) He explained that he was still very focused on restarting his life and "trying to get my life back on track." (*Id.*) He had just moved 120 miles away from everybody and "everything was finally lining up for me." (*Id.*) And then he felt mentally capable of taking the next step and correcting his life to clear his conscience. (*Id.*) M.A. confirmed that his supervision ended in 2008, so he was no longer at risk of revocation after that, but the affidavit was not signed until 2011. (*Id.*)

      M.A. confirmed that he was sixteen or seventeen at the time he alleged that his father had sexually assaulted him and that he understood how serious an allegation it was. (*Id.* at 48–49.) M.A. testified that his relationship with his father "changed drastically" in response to his allegations. (*Id.* at 51.) But, he testified, when his father called him from prison, he was just trying to be the father that was more concerned about making sure M.A. was okay. (*Id.*)

When asked if he ever had any kind of conversation with his father about the accusations of sexual assault, why M.A. was lying, the serious nature of the allegations, etc., M.A. responded, "He never pushed me to do any of that. He just wanted to always make sure that I was going to be okay." (*Id.* at 52.) M.A. confirmed that the two of them never really talked about the allegations, his father never asked him to admit he had lied, and he never apologized by phone or in a letter for lying and putting his father in prison for the rest of his life. (*Id.* at 53, 57–58.)

M.A. testified that it was very selfish of him to do what he did, and not a day has gone by that he does not regret it. (*Id.* at 26.) M.A. stated that he is now willing to take the risk of suffering any penalties for having admitted that he lied, whereas he was not at the time he testified in his father's trial. (*Id.* at 41.)

*Testimony about Trial Testimony*

M.A. testified that at the time of his father's trial, he had been between fifteen and seventeen years old, residing with his mother and her fiancé, and on juvenile probation. (*Id.* at 39, 41–42.) M.A. recalled testifying at his father's trial about sexual assault by his father and acknowledged that he had taken an oath to testify truthfully. (*Id.* at 6–8.) M.A. stated that when he testified at his father's trial, he was unaware that his father faced a life sentence if convicted. (*Id.* at 27.)

M.A. confirmed that the testimony he gave at trial was consistent with what he had told his KIT counselor, but he did not believe his counselor was ever there when he testified. (*Id.* at 39–40, 53.) Karen did not talk to M.A. much about his testimony in court prior to or after it. (*Id.* at 15.) M.A. stated that he moved on to another counselor at that point and began talking with him more about his program instead. (*Id.* at 15, 53, 54–55.)

29

M.A. testified that the entirety of the assaults he described in his testimony never happened. (*Id.* at 9.) M.A. confirmed that he fabricated the story and stated that he regretted his trial testimony. (*Id.* at 21, 23.) He explained that he did not know why he chose mutual masturbation as opposed to some other sexual contact, and that the numbers he gave for the number of times he was assaulted were "just random numbers that [he] pulled out of [his] head." (*Id.* at 47–48.) M.A. also stated that his testimony that his counselor was one of the few people he trusted had been incorrect. (*Id.* at 31.)

M.A. stated that he had spoken to Lila Behm before trial about recanting, but "[n]ot more than this is what I have to do from what I was told I needed to do to get the process on my end rolling." (*Id.* at 37–38.) When asked if he ever recanted to Behm prior to his father's trial, he stated, "I don't know a recantment or I'm going to do what was right." (*Id.*)

M.A. confirmed that he felt pressure from family and his father's friends to say at trial that this never happened, and that pressure continued for a very short period after trial. (*Id.* at 27–28.) M.A. explained that the whole family was hurt with the situation, but he continued to have contact with his family and some of his father's friends after the trial. (*Id.* at 28.) When his father's appeal began, M.A. started talking to family members about "the process of what I knew, what I had to do," but he did not recant to anyone at that time. (*Id.* at 37.) M.A. confirmed that he never told his counselors that he lied, did not remember ever discussing it with his father, and does not talk to his mother about any of this. (*Id.* at 53, 55.) He confirmed that he did not actually recant until his father lost his appeal. (*Id.* at 37.)

*Arnold's Appeal*

M.A. confirmed that he had been hoping to testify during his father's appeal in 2011, but nobody contacted him and he did not contact anybody during that time. (*Id.* at 38–39,

73.) M.A. stated that he had no clue how to contact anybody to participate in the process and was very naive about how to go about it on his own. (*Id.* at 73–74.) M.A. testified that at some point around December 2009, he authorized the release of his KIT records, but he could not remember to whom, or how he knew to whom to release them. (*Id.* at 36, 73–74.) He did not remember testifying at a court proceeding during his father's appeal allowing them to use those records for the purpose of the appeal. (*Id.* at 36.) M.A. confirmed that at the time of his father's appeal, he had wanted to submit an affidavit saying that he had lied at trial but also wanted to make sure he was "going to be okay, too." (*Id.* at 74.) When asked if he had ever had an opportunity to come to court to recant, he stated he was never informed of an opportunity to do during his father's appeal, and that if he had been asked to come to court prior to the evidentiary hearing to testify about his affidavit, he would have come. (*Id.* at 38–39.) M.A. confirmed that he did not testify at any 2011 appeal hearing for his father, although that was the year he signed a release for his counseling records and also the year he signed the affidavit. (*Id.*)

### The Affidavit

M.A. confirmed that he had one of his first mental breakdowns shortly after the trial due to regret, but he was too afraid to come forward at that point. (*Id.* at 53.) M.A. explained that he decided he wanted to clear the matter up shortly before or shortly after he was released from juvenile supervision, in 2007 or 2008. (*Id.* at 11–12.) He did not actually recant until his father lost his appeal in 2011. (*Id.* at 37.)

M.A. testified that he did not write the recantation affidavit himself. (*Id.* at 29.) The affidavit was written by his ex-stepmother, Randi Shaw, who contacted him by phone to

produce the affidavit shortly after his father's appeal was denied in 2011. (*Id.* at 10, 28–29, 55–56.) On direct examination, M.A. explained the context in which this occurred as follows:

> Q: So let's go back to -- You told Ms. Shaw over the phone about the contents of the affidavit. How did Ms. Shaw come to know that you -- How did she contact you about making this affidavit?
>
> A: It had been previously discussed, and then she had called me and kind of said this is one of the steps to take.
>
> Q: Let's go back then. You said it was previously discussed. Can you explain to me what you mean by that? With whom did you previously discuss it?
>
> A: With her.
>
> Q: With Randi?
>
> A: Yes.
>
> Q: How did that conversation occur?
>
> A: I don't know if she called me or if I called her.
>
> Q: The phone call -- A phone call occurred between the two of you?
>
> A: Correct.
>
> Q: And there's a discussion about an affidavit?
>
> A: Yes.
>
> Q: Can you tell me -- I mean, what was the content of that discussion?
>
> A: To be honest, I don't remember.
>
> Q: Do you -- Why would that phone call have occurred? Why would Ms. Shaw have been talking to you about an affidavit?
>
> A: Because I was looking to come forward and try and clear this matter up.

(*Id.* at 10–11.) The court asked for further clarification as follows:

> Q: So talk to me how this affidavit came about because it was not clear during your direct testimony. So you had been talking to ex-wife, a Ms. Randi Shaw?
>
> A: Correct.
>
> Q: Who initiated the contact?
>
> A: She had contacted me initially.
>
> Q: Okay.
>
> A: And she was kind of keeping me informed of what she knew was going on with the appeal process and stuff like that. And she felt that an affidavit might, you know, that would be my end of what I should have to do to get my statement retracted and out there.
>
> Q: So as best as you can, what made Ms. Shaw -- As best as you can remember, what made Ms. Shaw think that you would have information that would be helpful to put in an affidavit?
>
> A: Because it was my testimony that had put him away, so it needs to be my truth that comes out now to help to try and get him out.

32

Q:      And what made -- Did you tell Ms. Shaw, prior to her reaching out to
        you for this affidavit, you were now changing your story?

A:      Correct.

Q:      And how -- How did that come about is what I'm trying to understand?

A:      As best I can remember, it was -- We were discussing – His attorneys at
        the time were filing for the appeal and what steps I might have to take if
        they were, you know, to contact me or if I was going to have to testify.
        And from there, everything kind of gets a little blurry for me.

(*Id.* at 56–57.)

M.A. said that the affidavit used his words, but Shaw typed them pursuant to the phone call, although it was a couple of weeks between the phone call and the time she produced the affidavit. (*Id.* at 29.) M.A. could not recall what he told Shaw prior to her writing the affidavit, but stated that the contents of the affidavit had to be "pretty close." (*Id.* at 16.) M.A. explained that Shaw then came to Tomahawk, where he was living, and he rode with Shaw and two witnesses to the municipal building to have the affidavit notarized. (*Id.* at 17.) M.A. could not remember who the witnesses were and did not recall speaking with them about the content of the affidavit. (*Id.* at 17, 29.) M.A. confirmed that he read the document before signing it. (*Id.* at 10, 29.) M.A. testified that after the affidavit was signed, he let Shaw deal with it: she took it with her and he did not know what she did with it. (*Id.* at 17–18, 34.) He did not hear from her for a while, and then he got a phone call that she was deceased. (*Id.* at 17.)

M.A. stated that he has had contact of varying frequency by phone and letter with his father since his father has been imprisoned, including phone contact around the time he signed the affidavit in 2011. (*Id.* at 20, 35.) M.A. stated that his father never told him that he needed to sign the affidavit and no one ever pressured him, threatened him, or offered him any benefits for signing the affidavit. (*Id.* at 20–21.) M.A. testified that his father only asked him about the affidavit once, to ask "if it was taken care of," and explained that they did not

33

talk about the case very much. (*Id.* at 20, 35.) M.A. stated that he did not remember if his father ever told him to go talk to the police. (*Id.*) M.A. confirmed that his father had mentioned several times that his attorney might contact him, but the only attorney he ever heard from was the attorney representing Arnold at the evidentiary hearing. (*Id.* at 20, 36.)

M.A. stated that he never tried to give the affidavit to any of the people named on the back as copies. (*Id.* at 18.) He never tried to talk to ADA Elizabeth Swank, the prosecuting attorney, or any law enforcement officers or the victim witness coordinator about it. (*Id.* at 18–19, 34–35.) M.A. affirmed that the only person he talked to about the recantation was Shaw. (*Id.* at 18.) When asked why he had not taken an active role in making sure that his affidavit was seen by someone, M.A. stated, "I had put my trust in hoping that it was going to get taken care of because I was more focused on being selfish and taking care of myself" and explained that even though he had wanted to take a more active role, he had been focusing on getting his life back on track. (*Id.* at 19, 35.) He further explained that he believed that "once this affidavit was written, that it would get into the lawyer's hands or the prosecutor's hands or somebody's hands that would then basically contact me and tell me, okay, this is how we need to proceed with this because I'm not familiar with this process at all. So . . . I sat back and waited and hoped to hear from an attorney." (*Id.* at 74.)

At the evidentiary hearing, M.A. stated that he had last looked at the affidavit a few weeks before, and there was nothing in the affidavit that he felt needed to be changed. (*Id.* at 16.) M.A. swore to and affirmed the truth of the contents of the affidavit. (*Id.* at 10.) When asked why he should be believed now, M.A. responded that he hoped and prayed people would believe him, and affirmed he was telling the truth. (*Id.* at 22–23.) M.A. stated that he wants to see his father get out of prison, not only because he deserves to be out because the

abuse never happened, but for the family, and he wants Arnold to be a part of his granddaughter's life. (*Id.* at 24.) M.A. testified that he would not lie to make that happen. (*Id.*)

M.A. testified that if Shaw had never contacted him, he would have written the affidavit. (*Id.*) He could not give an exact timeline for when he would do so, but stated, "I was getting to that point in my life where I was comfortable. I was settled. I was becoming strong enough mentally to do this on my own, but I had somebody there at this point to kind of guide me along the way." (*Id.* at 74–75.) M.A. explained that there is a difference between being comfortable mentally to do what is right, and being mentally able to handle it. (*Id.* at 75.) M.A. stated that mentally he is prepared to take this "head on." (*Id.*) "Whether I end up locked up or if I end up institutionalized again, this is what I am going to do until this situation is taken care of. Because it's what needs to be taken care of not for myself, not for my child, but it needs to be taken care of for him because he needs to be out because he doesn't deserve to be there anymore." (*Id.*) M.A. confirmed that he never thought his father deserved to be in prison. (*Id.*) M.A. testified that he loves his father and never wanted him to go to prison. (*Id.* at 33.) He stated that he feels guilt every day associated with his trial testimony and with his father being in prison. (*Id.* at 34.) He stated that the guilt would be the same whether the accusations were true or false. (*Id.*)

*Mental Health*

M.A. testified that he currently suffers from depression, although he is not in counseling for it and does not take medication for it. (*Id.*) M.A. explained that he has had signs of depression throughout his life, but his depression worsened after his father's trial and he started drinking. (*Id.* at 60.) He stated that he attempted to take his life several times and was institutionalized in a mental health facility each time. (*Id.*) M.A. explained that "the

35

whole process itself" has placed a very big mental strain on him and he has had several breakdowns over it. (*Id.* at 19.) M.A. explained as follows:

> Q: When you say you've had several breakdowns, what is the cause of those breakdowns?
> A: A lot of it -- It all kind of started when this process started to really take a roll, change. And just the mental stress of everything, and I started drinking. And mixing that with my depression, I was institutionalized three times in the last year-and-a-half.
> Q: If I could just clarify that. What do you mean by the process, Mr. Arnold? What is the process you're talking about?
> A: The hearing was -- I was starting to hear from people about the court dates and things were starting to move along compared to when I signed the affidavit and heard nothing for I don't remember how long.

(*Id.* at 19–20.) M.A. explained further that when he heard about the evidentiary hearing, it caused him to be institutionalized. (*Id.* at 34, 59.) About two months before the evidentiary hearing, he had gone to a bar and drunk very heavily and ended up sitting in his kitchen with a gun to his head until the Lincoln County Sheriff's Department came in and dragged him out of his house and placed him under involuntary commitment for four days. (*Id.* at 59.)

### Testimony of Karen B.

Karen B., M.A.'s former counselor from the KIT program, testified by video deposition. Karen testified that she did not remember M.A., only his name. (Evidentiary Hearing (May 13, 2019) Ex. 5 at 4.) Karen testified that during the relevant time she was a social worker and coordinator of the KIT program. (*Id.*) Karen testified that the KIT program was designed to "help kids who hurt other kids in a sexual way." (*Id.* at 15.) KIT was not a residential program; the juveniles lived at home, in shelter care, or in group homes. (*Id.* at 35.) Participation in KIT was court-ordered. (*Id.* at 17.) Karen provided the juveniles with group treatment and some individual sessions. (*Id.* at 4.) Her role was not to discover rule violations

or enforce rules but to help the child understand why they chose to harm another child. (*Id.* at 36.)

Karen confirmed that if a juvenile disclosed a rule violation, depending on the violation, she would report it to the juvenile's social worker. (*Id.* at 6.) However, she did not have authority to place juveniles in detention or to revoke their supervision. (*Id.* at 6–7.) Karen testified that she never used the threat of detention to force participation in counseling. (*Id.* at 7.) Her approach, rather, was to develop a "therapeutic alliance" where she gains the juvenile's trust to "have the ability to hear and listen and help." (*Id.*) Karen testified that if she suspected that a juvenile was a victim of a sexual assault, she would approach the matter "gingerly." (*Id.* at 7.) Although she would not ignore it, she would wait for the child to tell her. (*Id.* at 8.) She testified that if the child was guarded or unwilling to disclose, she would not push the issue with them. (*Id.*) She testified that she would never suggest to the child that someone in particular had victimized them or that they were victimized in a certain manner or with a certain type of contact. (*Id.* at 8–9.)

### Testimony of Mark L. Goldstein

*Assessing Child Allegations of Abuse*

Dr. Mark L. Goldstein, a child psychologist retained by Arnold, testified that children may make false allegations of abuse. (Evidentiary Hearing (May 13, 2019) Tr. at 15, Docket # 55.) Goldstein confirmed that the research he relied on concluded that false reports share some common characteristics, such as lack of detail and an inappropriate emotional response. (*Id.* at 45.) Goldstein testified that false disclosures are especially prevalent in child custody and post-child custody incidences, where one parent might coach the child and make threats if the child does not say what the parent tells them to. (*Id.* at 20–21.)

When asked what he might look for during an interview with a child for possible signs that there might be a false allegation, Goldstein pointed to three major factors. (*Id.* at 15–16.) First, Goldstein explained that children who are disclosing truthfully are typically consistent with major facts, but frequently inconsistent with minor facts. (*Id.*) When a child is consistent with minor facts, it raises suspicion that they have been coached. (*Id.* at 16.) Goldstein explained that an example of a major fact would be that the assault occurred or that it involved masturbation versus intercourse, while a minor fact would be something like the day or time it had occurred. (*Id.* at 17, 63.)

Second, Goldstein explained, he looks for language that is not appropriate from the child, for example, vocabulary that would not be typical of that age or that child's developmental stage. (*Id.* at 16.) Goldstein also explained that he looks for other things that are developmentally inappropriate—for example, a young child remembering details of abuse she said had happened when she was two, while it is neurologically impossible for her to have such memories from such a young age. (*Id.* at 17.) This indicated coaching. (*Id.*)

Third, Goldstein looks at emotionality. (*Id.* at 16.) Goldstein explained that it is a common mistake to think that a child who has been abused will have a lot of emotion attached to their disclosure—in fact it is the opposite. (*Id.*) Children or adolescents who are being false typically show a lot of emotionality, whereas children who have actually been abused have what is called "flat affect" or a lack of reactions; they attach very little emotionality to it. (*Id.* at 16, 64.)

Goldstein explained that there is a significant difference between a young child and an adolescent (ages 12/13 through 18/19) when it comes to falsely reporting incidences of sexual abuse. (*Id.* at 17–18.) Young children will falsely disclose at times, but the literature says it is

38

fairly infrequent, at the most 5 or 10% percent of the time. (*Id.* at 18.) With adolescents, the literature says the incidence of false disclosure is as high as 30 to 35% percent. (*Id.*) In other words, the literature suggests significantly higher incidences of false allegations from adolescents than from younger children. (*Id.*) Goldstein explained that younger children tend to be more honest and rules-oriented generally, whereas adolescents display more oppositional kinds of behavior that results in telling untruths. (*Id.* at 18–19.) Goldstein also explained that adolescents more commonly have "pseudo memory," i.e. they think they remember something in a particular way but do not necessarily remember it that way. (*Id.* at 19.)

Goldstein explained that several factors might motivate a child to make a false accusation. (*Id.* at 21.) Goldstein stated that the first is anger. (*Id.*) Goldstein also stated that the presence of emotional and/or behavioral problems can contribute to the incidence of false disclosures. (*Id.* at 19.) Goldstein explained that children with emotional and especially behavioral issues often have some level of oppositional behavior. (*Id.* at 21.) They may have been in the court system themselves, be acting out at school, be in a Behavior Disorder Program at school, and/or been in a residential program and been labeled juvenile delinquents. (*Id.* at 21–22.) Goldstein explained that because of that oppositionality, these adolescents have a greater tendency to lie or deceive. (*Id.* at 22.) On the other hand, Goldstein confirmed that individuals who truly are victims of sexual assault surely have behavioral and emotional problems, and that individuals with behavioral and emotional problems are possibly more vulnerable to sexual abuse. (*Id.* at 38–39.)

Goldstein also stated that a child might be motivated to make a false accusation if the child has heard or witnessed someone else or been aware of someone else who has been

sexually abused, "almost as a means of getting attention," consciously or unconsciously; a kind of "copycat effect." (*Id.* at 21, 22.) Goldstein explained that attention by itself is another possible reason why a child would falsely accuse. (*Id.* at 21.)

Goldstein explained that professionals may not be good at detecting false reports. (*Id.* at 22.) Psychologists, police officers, FBI [agents], and CIA analyists are no better than the average person at assessing truth versus untruth, and it is no better than chance. (*Id.* at 22–23.) Goldstein also confirmed that mental health professionals, judges, and child protective service workers are likely to believe child sexual assault allegations, which leads to a "confirmatory bias" during interviews. (*Id.* at 23.) The interviewer goes in with the belief, not necessarily conscious, that the child was abused, and then the interviewer questions in such a way as to validate that conclusion. (*Id.*) Goldstein explained that if you ask questions a certain way, children assume you want a certain answer from them, and this will contribute to the likelihood of a false allegation. (*Id.*) Goldstein stated that it is sometimes possible to know by reviewing an interview of a child whether an interviewer has contributed to the false allegation, as some that are so flawed that it leads to the conclusion that the interviewer was clearly influencing the child. (*Id.* at 23–25.) On the other hand, Goldstein clarified that if a child is asked leading questions during an interview, it does not necessarily make the interview inherently unreliable. (*Id.* at 46.)

Goldstein confirmed that the false allegation rate is between 5 and 35%, and that range can be attributed to a multitude of factors, including that not all researchers define false allegations the same way. (*Id.* at 42–43.) Goldstein explained that some researchers include unintentional false allegations or misunderstandings and false suspicions within that definition, but those are not present in this case. (*Id.* at 43.) False allegations may also be

40

attributed to adults alleging that the child has been sexually assaulted, which is also not present in this case. (*Id.*) Goldstein stated that he was not aware of any research about false allegations by adolescent males of sexual assault by a father where there is no on-going custody or visitation dispute. (*Id.*)

Goldstein confirmed that the adolescent group had the highest rate of false disclosure, but clarified that that included both child abuse and child sexual abuse, and he could not recall if the study broke down between the two. (*Id.* at 43–44.)

Goldstein stated that the literature supports that it is statistically harder for males to report sexual abuse than females, harder for males to report same-sex sexual assault than to report opposite-sex sexual assault, and harder to report sexual assault by family members. (*Id.* at 62–63.) Goldstein confirmed that disclosure by young children tends to be more accidental, while disclosure by adolescents tends to be more purposeful. (*Id.* at 62.)

*Assessing Recantations of Child Allegations of Abuse*

Goldstein stated that there are no studies on adults recanting allegations of sexual abuse that allegedly occurred when they were adolescents. (*Id.* at 62.) Goldstein stated for recantations of childhood sexual abuse generally it is not uncommon for there to be a recantation, and then a retraction of a recantation, so there is nothing inherently reliable about a recantation. (*Id.* at 47.)

Goldstein agreed that one reason someone could retract a statement of abuse would be because of family pressure to do so, but there is minimal research on that. (*Id.* at 56–57.) Goldstein stated that two major reasons people recant are falsity of the statement, and guilt, which may come shortly thereafter or many years later. (*Id.* at 57.) Goldstein cited to an article whose name and author he could not recall stating that recantation of a false disclosure often

41

happens after the person has matured, married, had a family, and then is living with this guilt, and typically recants to their own counselor or therapist. (*Id.*) Even when the sexual assault did occur, the person may feel guilty "and now they're living with it and it's eating them up." (*Id.*) Goldstein was not aware of any work in this subgroup on gender breakdown or on what role the passage of time plays. (*Id.* at 58.)

<i>M.A.'s Allegations and Recantation</i>

Goldstein clarified that he was not asked to provide an opinion as to whether M.A. was telling the truth and was unable to make that assessment. (*Id.* at 29.) Goldstein confirmed that he reviewed the Criminal Complaint, the State's Motion to Introduce Expert Testimony, Huebner's testimony at trial, M.A.'s testimony at trial, M.A.'s recantation, and M.A.'s testimony at the evidentiary hearing before this Court, and he interviewed M.A. on March 29, 2019. (*Id.* at 32.)

Goldstein confirmed that he conducted a telephone interview of M.A. "to hear what he had to say," and in particular to hear why he suddenly recanted after all these years, to see whether it was possibly a false disclosure and what M.A.'s reasons were for recanting. (*Id.* at 28.) Goldstein stated that M.A. told him he was angry at his dad, that he was in a group that had brought up sexual abuse, and he felt that the counselor pushed him to accuse his father. (*Id.* at 31.) Goldstein stated that M.A. said he felt that if he did not testify he might get put back in detention. (*Id.*) Goldstein did not review the trial testimony and agreed that he had a limited understanding of the facts of the recantation. (*Id.* at 33–34.)

Goldstein testified that some things from his interview with M.A. were consistent with what the research shows about possible false allegations. (*Id.*) First, Goldstein pointed out that M.A. was a troubled young man at the time with some behavioral and emotional

42

problems and involved in the court system. (*Id.*) Second, M.A. said he had been angry at his father because he would come for weekends at his grandparents' home expecting to spend time with his dad, and his dad would be mostly off with his girlfriend. (*Id.* at 30.) Third, Goldstein stated that M.A. shared with him how his mother would badmouth his father all the time, which can create negative feelings towards the father. (*Id.*) Goldstein clarified that his forty-year experience in this field suggest that those sorts of negative feelings may contribute to false allegations, but there is nothing in the literature on it. (*Id.*)

Goldstein agreed that it is not uncommon for an abuse victim to be angry with his or her perpetrator, and admitted that he had seen in his practice the internal struggle with sexual assault victims loving their perpetrator when it is a close family member but being angry about the abuse at the same time. (*Id.* at 39–40.) Goldstein agreed that the research shows that when a child reaches the age of ten, he is no more impressionable than an adult. (*Id.* at 42.) Goldstein confirmed that he saw in the Criminal Complaint that M.A. disclosed in some detail, but did not recall reading that M.A. had a very flat, matter-of-fact type of disclosure. (*Id.* at 46.) Goldstein confirmed that this would support that the initial disclosure was true. (*Id.*)

Goldstein stated that M.A. talked about feeling guilty, and stated that if someone feels guilty and is sitting on that guilt for a long time, "sometimes it breaks forward when somebody does something about it." (*Id.* at 30–31.) Goldstein stated that the nervousness and fear of repercussions that M.A. expressed about the affidavit could possibly be because the recantation is false. (*Id.* at 47–48.)

Goldstein explained that his review of the literature disclosed that adolescents are the highest group by far of false disclosures. (*Id.*) Goldstein testified that there is not a body of

literature on recantation for adolescents, and M.A.'s recantation came as an adult, "so it's different all together." (*Id.* at 61.) He admitted that some of the literature he relied on for his report to the court may not have been directly on point. (*Id.* at 50–51.)

Goldstein explained that it is difficult to ascertain the truth of a recantation that comes many years after the false disclosure because one must rely upon the word of the individual at that time without any data—unless, of course, somebody else comes forth as an external source, says it never happened, and admits to coaching the person, which Goldstein testified is unlikely to happen. (*Id.* at 58–59.) Goldstein admitted that there is no scientific instrument one can apply to the person who has made the accusation to validate whether the retraction is true or false. (*Id.* at 59.) Goldstein stated that there is no list of factors that can compare the original accusation or testimony to the current position that can help evaluate the conflicting positions in this case, as too many years have transpired. (*Id.*)

Goldstein stated that he read M.A.'s testimony from trial several months prior and could not evaluate whether it was consistent or inconsistent with being a victim of sexual assault. (*Id.* at 59–60.) He reiterated that there were factors that were consistent with it being a false allegation: M.A. was a troubled young man, he was angry with his father for not spending enough time with him,, his mother bad-mouthed his father, and he was pushed by the counselor. (*Id.*) When asked if there were factors supporting the opposite conclusion, Goldstein stated that he did not recall seeing this but if there were small inconsistencies in his trial testimony, or if he displayed a lack of emotionality, then that would suggest that maybe he was being truthful. (*Id.* at 60–61.) He also indicated that the fact that a relative of some kind, perhaps his father's ex-wife, helped him with the affidavit, might be a factor suggesting the recantation was false. (*Id.* at 61.)

44

## ANALYSIS

*1. Legal Standard*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, governs this case. Under AEDPA, habeas petitions challenging state court confinement are subject to the statute of limitations set forth in 28 U.S.C. § 2244. That section provides that "[a] 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). There is no dispute that Arnold filed his habeas petition beyond the one-year time limit. Consequently, Arnold's petition is barred as untimely unless he can establish that he qualifies for an exception to the time limit. Arnold invokes the actual innocence exception.

Actual innocence can be an equitable exception to the limitations period for a habeas action. *Arnold*, 901 F.3d at 836. *Schlup v. Delo*, 513 U.S. 298 (1995) provides the framework for evaluating claims of actual innocence as a gateway to review of a habeas petition that would otherwise be untimely. *Id.* To overcome a petition's untimeliness, "a claim of actual innocence must be both credible and founded in new evidence." *Id.* (citing *Schlup*, 513 U.S. at 324). Credibility requires that the claim "have the support of 'reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Id.* (citing *Schlup*, 513 U.S. at 324). The evidence must also be "new," i.e., it was not before the previous trier of fact. *Id.* at 836–37 (citing *Schlup*, 513 U.S. at 324; *Gladney v. Pollard*, 799 F.3d 889, 896, 898 (7th Cir. 2015)). The burden is on the petitioner to show that "'it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt'" in light of the new evidence. *Id.* at 837 (quoting *Schlup*, 513 U.S. at 327).

45

In evaluating a claim of actual innocence, the court makes a comprehensive assessment that considers any reliable evidence probative of the petitioner's innocence or guilt, even evidence that was previously excluded or that would be excluded under the rules of evidence at trial. *Id*. (citing *Schlup*, 513 U.S. at 327–28). The court does not "determine independently what the petitioner likely did or did not do"; rather, it "assess[es] the likely impact of the new evidence on reasonable jurors." *Id*. (citing *Schlup*, 513 U.S. at 868). Any delay or lack of diligence by the petitioner in pursuing his claim of actual innocence is not a bar to the claim, but it is one factor the court may consider in assessing the claim's merits. *Id*. (citing *McQuiggin v. Perkins*, 569 U.S. 383, 388–400 (2013)).

2.  *Application to This Case*

As evidence of his actual innocence, Arnold proffers M.A.'s recantation affidavit and the evidence produced at the evidentiary hearing. (Docket # 56.) Because the affidavit and the testimony from the evidentiary hearing were not previously presented to the jury, they are "new" evidence under *Schlup. See Arnold*, 901 F.3d at 838. The questions, then, are whether this new evidence is reliable, and whether it is more likely than not that no reasonable juror would convict Arnold in light of the totality of the evidence.

2.1    Reliability of New Evidence

Courts look upon recanted testimony with great suspicion, making it highly unlikely to meet the demanding *Schlup* standard. *See, e.g.*, *Kirkman v. Calloway*, No. 14-CV-2398, 2019 WL 1572492, at *9 (N.D. Ill. Apr. 11, 2019) (remarking that "the Court is skeptical of recanted testimony submitted years after the trial" (citing *Herrera v. Collins*, 506 U.S. 390, 392, 417 (1993))), *aff'd sub nom. Kirkman v. Thompson*, 958 F.3d 663 (7th Cir. 2020). Beyond courts'

general skepticism attached to recantations, there are several features of M.A.'s recantation that undermine its reliability.

First, M.A.'s 2011 recantation affidavit was generated three years after Arnold's jury trial. At trial, M.A.—then seventeen years old—testified about events that occurred years earlier, when he was thirteen and fourteen years old. A reasonable juror could credit M.A.'s trial testimony as more accurate because it was closer in time to the incidents.

Second, the timing of M.A.'s affidavit brings its reliability into question. M.A. testified that Shaw—Arnold's ex-wife with whom he stayed on good terms—called him shortly after Arnold lost his direct appeal in 2011. (Docket # 43 at 10–11, 28–29, 55–57.) M.A. testified that Shaw had been keeping him informed of what was going on with Arnold's appeal and he had told her that he was changing his story. (*Id.*) Shaw informed him over the phone that he would need an affidavit to get his statement "retracted and out there." (*Id.* at 56.) A week after Arnold lost his appeal, M.A. signed the recantation affidavit. Tellingly, eight months earlier, M.A. had appeared at a court hearing during Arnold's direct appeal. (Docket # 45-5.) Although M.A. did not testify at that hearing, M.A. did speak to the judge on the record confirming that he had spoken to the prosecutor prior to the hearing. (*Id.* at 2–5.) At no point before, during, or after that hearing did M.A profess Arnold's innocence to the judge, defense attorney, or prosecutor. A reasonable juror could question why M.A. did not take the opportunity while in court in 2011 to reveal his father's innocence rather than waiting until he lost his appeal months later.

Third, and more damaging than the delay and the timing of the affidavit, is the fact that M.A. himself never initiated steps to exonerate his father. By M.A.'s account, the recantation affidavit was entirely the product of Shaw's initiative. As discussed above, it was

Shaw who initiated the contact after Arnold lost his direct appeal. It was Shaw who drafted the affidavit. It was Shaw who picked up M.A., procured two witnesses, drove them all to the notary for signing, and took the affidavit with her afterward. M.A. further testified that after the affidavit was signed, he had nothing to do with it and did not know what Shaw did with it. (Docket # 43 at 17–18, 34.) A reasonable juror could conclude that if M.A. had actually fabricated the allegations and wanted to exonerate his father, he would have initiated the affidavit himself or shown at least some interest in what happened with it after he signed it.

Just as M.A. did not initiate or take responsibility for the affidavit in 2011, he took no steps in the following years to clear his father's name. Even M.A.'s testimony at the evidentiary hearing was not the product of M.A.'s own initiative but the result of his father's habeas attorney contacting him years later. (Docket # 43 at 20, 23.) Furthermore, this opportunity to clear his father's name appears to have caused M.A. much emotional distress. M.A. testified that after he learned that he would be asked to testify at the evidentiary hearing, he suffered a severe deterioration in his mental health which culminated with him putting a gun to his head and eventually being placed in involuntary commitment. (*Id.* at 59.) A reasonable juror could conclude that M.A.'s emotional turmoil indicated that M.A.'s recantation was false and the allegations against Arnold true. Indeed, Arnold's own expert witness testified that the nervousness and fear that M.A. expressed about the affidavit could be attributable to the falsity of the recantation. (Docket # 55 at 47–48.)

M.A. offers no coherent narrative to explain the delay in generating the recantation affidavit. M.A. primarily testified that he did not come forward to clear up his father's conviction because while he was on juvenile supervision he feared the consequences, including imprisonment if he admitted to lying. (Docket # 43 at 11–12, 26, 40–41, 53.)

However, M.A. testified that he was released from juvenile supervision in 2007 or 2008, yet he did not sign the recantation affidavit until 2011. M.A. also testified that after he completed juvenile supervision, he needed time to get mentally fit before he could admit that he had lied (*id.* at 51), but what efforts did M.A. initiate after he was discharged from supervision and purportedly felt mentally able to clear his father's name?

In all, the timing of the recantation affidavit and M.A.'s lack of initiative in seeking to exonerate his father seriously undermine the reliability of the evidence. They would likely indicate to a reasonable juror that M.A.'s eventual recantation was not the product of his father's innocence, but of complicated family dynamics. Years of family pressure reveal themselves in the trial transcript and M.A.'s testimony at the evidentiary hearing. At trial, M.A.'s great-aunt testified that family members had made appointments for M.A. to go talk to the defense investigator, which he never kept. (Jury Trial Tr. 522–24, Docket # 31-3 at 99–101.) Behm testified that she asked M.A. if he would go see the investigator if she went with him, and M.A. said yes. (Jury Trial Tr. 523, Docket # 31-3 at 100.) Behm stated that she made the appointment, but M.A. called to tell her he could not make it because he had a doctor's appointment. (*Id.*) She indicated that she knew M.A. had been reluctant to contact the defense investigator and never went to the appointments family members set up because he always had something else to do. (Jury Trial Tr. 528, Docket # 31-3 at 105.) At trial, M.A. testified that the reaction of relatives to his accusation was not always positive, especially on his father's side. He testified that he stopped getting invited to a lot of things and he became the "red-headed stepchild of the family for a while." (Docket # 43 at 50.) At the evidentiary hearing, M.A. testified that Shaw kept him abreast of his father's appeal and told him that he would need to retract his story and "get it out there" (Docket # 43 at 10–11, 56–57), which

he did not do until Shaw essentially did it for him. M.A. testified that his father did not pressure him, but admitted that even his father asked him once if the affidavit had been taken care of. (*Id.* at 20–21.) It would not be a bridge too far to conclude that, with Arnold serving a term of imprisonment for life, some form of family pressure on M.A. never entirely dissipated.

Even crediting M.A.'s testimony that his father and family members did not directly pressure him to recant, other familial motives to recant are evident in the record. At trial, M.A. testified that he loved his father and that he wanted him to get help. (Jury Trial Tr. 218–19, Docket # 31-2 at 28–29.) From this testimony, a reasonable juror could conclude that M.A. never wanted his father to go to prison, not because the sexual assault did not occur, but because he loved his father. At the evidentiary hearing, M.A. confirmed his love for his father and, importantly, admitted that he did not know at the time of the trial that his father faced life in prison if convicted. (Docket # 43 at 27, 33.) From this testimony, combined with M.A.'s testimony about his feelings of guilt over his father's imprisonment (*id.* at 34), a reasonable juror could discount M.A.'s recantation as a product of post-trial awareness that his father would be in prison for the rest of his life, especially after Arnold lost his direct appeal in 2011. Furthermore, Dr. Huebner testified that the percentage of recantations because the abuse allegations are not true is small; more commonly, an individual recants due to external pressure or awareness of the consequences of having disclosed the abuse. (Jury Trial Tr. 360, Docket # 31-2 at 170.) A reasonable juror could conclude that such is the case here, further undermining the reliability of M.A.'s affidavit and recantation at the evidentiary hearing.

2.2    Totality of the Evidence

M.A.'s recantation must be assessed in the full context of his original disclosure and trial testimony to determine if a reasonable juror would still find Arnold guilty beyond a reasonable doubt. Even in light of the new evidence, a reasonable juror is likely to find M.A.'s trial testimony credible.

M.A.'s primary explanation for having falsely accused his father is that his counselor pressured him, but he also testified at the evidentiary hearing that his counselor did not coach him on any of the details of his accusation and was not present when he was interviewed by the police or the prosecutor or when he testified at trial. (Docket # 43 at 39–40, 53.) It was the evidence from trial, not anything M.A. told his counselor, that the jury found to have credibly proven sexual assault. Additionally, M.A.'s trial testimony showed a pattern of disclosure that was largely consistent with Dr. Goldstein's review of the scientific literature about truthful disclosures by adolescents of sexual assault. Specifically, as described above, Dr. Goldstein testified that it is statistically harder for males to report sexual abuse than females, harder for males to report same-sex sexual assaults than to report opposite-sex sexual assaults, and importantly, harder to report assaults by family members. (Docket # 55 at 62–63.) At trial, M.A. testified that he felt hurt and scared that his own father sexually assaulted him and that he had waited many months to disclose the abuse because he was afraid people would think he was gay, he was afraid of losing family relationships, and he just did not feel comfortable. (Jury Trial Tr. 206, 212, 214; Docket # 31-2 at 16, 22, 24.) Other aspects of M.A.'s trial testimony were consistent with the experts' descriptions of truthful disclosures, too: M.A.'s inconsistency with some minor details; difficulty in remembering the exact number of times that the assaults occurred; his seeming lack of emotion while testifying; his

51

purposeful rather than accidental disclosure; his disclosure to a counselor he had grown to trust rather than to a family member; and his conflict over loving his father and wanting the abuse to stop. These features of M.A.'s disclosure and trial testimony, which he admits were *not* coached by his counselor, would gravely undermine a reasonable juror's belief that his trial testimony was false.

Beyond M.A.'s own testimony, the other evidence introduced at trial would not alter a reasonable juror's assessment that M.A.'s trial testimony was more credible than his recantation. Two witnesses, Behm and Augsburger, both testified at trial that M.A. had denied the allegations against Arnold. However, Behm was Arnold's aunt and Augsburger one of Arnold's closest friends; a juror could discount their testimony as fabricated or embellished due to their loyalty to Arnold. A reasonable juror could also conclude that M.A. had made these statements, but had done so only to appease these individuals. Indeed, by both Behm's and Augsburger's accounts, M.A. did not spontaneously recant, but made these statements in the context of the adults probing him for information. (Jury Trial Tr. 505, 523; Docket # 31-3 at 82, 100.) A reasonable juror could conclude that even if M.A. did deny the assaults to Behm and Augsburger, the denials were the product of a desire to avoid embarrassment and blame or to avoid hurting his family and friends. This narrative is supported by M.A.'s apparent resistance to his family's urging that he recant before trial; Behm described how M.A. would agree to family members' urging to meet with defense investigator to tell the "truth," but never actually do it. (Jury Trial Tr. 522–24, 528; Docket # 31-3 at 99–101, 105.) And in the end, M.A. steadfastly maintained at trial that Arnold sexually abused him and denied recanting. M.A. testified at trial that he had not recanted "[b]ecause it did happen and I wasn't going to lie about it because if I would have said it didn't happen

and then I couldn't have went on knowing that it did happen and nothing goes on about it." (Jury Trial Tr. 274, Docket # 31-2 at 84.)

A reasonable juror could also find Arnold guilty despite the fact that M.A. did not note Arnold's genital piercings or tattoos at trial. A reasonable juror could conclude, for example, that M.A. masturbated Arnold without touching the piercings. Similarly, a reasonable juror could credit M.A.'s testimony that he was uncomfortable when he spoke with the detective and that is why he went along with the higher number of sexual assaults. Perhaps more compellingly, a reasonable juror could determine that both of those details are the kinds of details that the experts testified victims might not mention or recall even though they maintain that the sexual assaults occurred.

Finally, in considering the totality of the evidence, it is worth noting that Arnold testified at trial that M.A.'s accusations hurt him a lot and that he was shocked by them. (Jury Trial Tr. 572–73, Docket 31-3 at 149–50.) Yet M.A. testified at the evidentiary hearing that in all this time, Arnold never asked M.A. why he fabricated such allegations against him or encouraged him to deny the assaults. A reasonable juror could find Arnold's failure to broach the subject with M.A. difficult to reconcile with Arnold's claim of actual innocence.

There is, of course, another possible narrative: that M.A. lied at trial and his recantation is truthful. Dr. Goldstein testified to several factors that might contribute to a false disclosure that a juror could find relevant to M.A.'s case. M.A. was a deeply troubled adolescent; Goldstein testified that adolescents may display oppositional behavior including false sexual assault allegations, and more so when there are emotional and behavioral problems. (Docket # 55 at 18–19, 21.) M.A. claims now that he falsely accused his father out of anger; Goldstein testified that an angry child might seek retribution against a parent by

53

falsely alleging sexual abuse. (*Id.* at 21.) M.A. testified at trial that he had spoken with another child who had reported sexual abuse to a counselor in the KIT program before he reported to his own counselor (Jury Trial Tr. 212–13, Docket # 31-2 at 22–23); Goldstein reported that some adolescents may falsely disclose sexual abuse to seek attention after learning that a peer has done so (Docket # 55 at 21–22). Viewing this new evidence and M.A.'s recantation in light of the entire record, it is possible that a reasonable juror could acquit Arnold.

However, it is not enough to meet the demanding *Schlup* standard that *a* reasonable juror could credit the new evidence and acquit Arnold. Arnold must show that it is more likely than not that *no* reasonable juror could convict him. For all the reasons discussed above, Arnold has not met that burden.

## CONCLUSION

Arnold's conviction was based exclusively on M.A.'s testimony. Accordingly, as Arnold correctly points out, there is no objective proof of innocence that Arnold can offer. However, while in some instances a victim's recantation might be compelling and sufficient evidence of innocence, in light of a full review of all the evidence in this case, I conclude that a reasonable juror could find M.A.'s recantation affidavit unreliable and his testimony at the evidentiary hearing unpersuasive, believe that M.A.'s trial testimony was truthful, and find Arnold guilty beyond a reasonable doubt. Because Arnold fails to show that it is more likely than not that no reasonable juror would have found him guilty in light of the new evidence, he has not met the actual innocence exception and the untimeliness of his petition requires dismissal. Accordingly, I need not address Arnold's stand-alone claim of actual innocence.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4 (1983)).

When issues are resolved on procedural grounds, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Each showing is a threshold inquiry; thus, the court need only address one component if that particular showing will resolve the issue. *Id.* at 485.

Here, I find that the issues raised by Arnold's habeas petition deserve encouragement to proceed further. Accordingly, I will grant a certificate of appealability to encourage development of these issues.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Respondent's motion to dismiss (Docket # 13) is **GRANTED**.

**IT IS FURTHER ORDERED** that Arnold's petition for a writ of habeas corpus (Docket # 1) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

Dated at Milwaukee, Wisconsin this 7th day of August, 2020.

BY THE COURT:

_s/Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge